## Potter v. Webb, et al.

(Decided November 7, 1919.)

## Appeal from Letcher Circuit Court.

1. Judgment—Collateral Attack.—In a collateral attack upon a judgment and proceedings in an old action every presumption must be indulged in favor of the validity of such judgment, and it will be conclusively presumed that all prerequisite proceedings were observed unless the contrary affirmatively appears.

2. Judgment—Collateral Attack.—Where in an old action the records have been carelessly kept, papers are missing and orders not properly entered, a denial in a separate and subsequent action between different parties that the customary proceedings were taken to carry into effect the judgment entered therein constitutes a collateral attack against the judgment and proceedings in that action.

3. Judgment—Collateral Attack—Presumptions.—In an action filed in 1866 by an administrator against the heirs and creditors to settle an intestate's estate, a judgment was entered that to pay debts it was necessary to sell decedent's one-half interest in a 200-acre patent, and the master was ordered to sell same and take from the purchaser sale bonds. Reports of the commissioner are missing from the papers and orders subsequently entered are not full or entirely clear, but held upon collateral attack sufficient to warrant the presumption that sale was made and purposes of the action accomplished, nothing to the contrary appearing.

D. D. FIELDS, ED. C. O'REAR, HAGER & STEWART and W. H. MAY for appellant.

BLAIR & HAWK, F. W. STOWERS and W. G. DEARING for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

Appellees, plaintiffs below, the real representatives of John B. Adams, deceased, sued appellant, W. H. Potter, and others in possession, to quiet their title to an undivided one-half interest in certain lands covered by a patent issued to John B. Adams and Benjamin Adams in 1860, and for partition of the land. Potter answered denying plaintiffs' title and asserting title in himself by adverse possession by himself and predecessors in title for more than forty years. The case was prepared and tried solely upon the issues between the plaintiffs and the defendant, Potter, and the court having adjudged that plaintiffs were the owners of an undivided one-half

interest in the land and ordered same to be partitioned, charging Potter with a certain acreage in the possession of one of his co-defendants under title from his predecessor in title, Potter appeals.

Manifestly the first question for our consideration is whether or not the plaintiffs were the owners of an undivided one-half interest in the land, for unless so, they had no right to disturb the admitted possession of Potter, which possession he claims has been held by himself and his predecessors in title adversely to plaintiffs and all the world for more than forty years, but which possession plaintiffs claim has been amicable through the whole of that period because of their being co-tenants as a result of defendant's predecessor in title having purchased the other undivided one-half interest therein from Benjamin Adams in 1874.

That plaintiffs are the only heirs of John B. Adams, who by the patent above mentioned acquired title to an undivided one-half interest in the land in dispute, and that he owned same when he died intestate in 1863, is admitted, but it is insisted by the defendant that plaintiffs were divested of this interest in the land by the proceedings and judgment in an action filed after the death of John B. Adams by his administrator, Randolph Adams, against his heirs and creditors for the purpose of settling his estate. If this is true, not only would they have no title to the land, but the possession of the defendant and his predecessors in title, which is overwhelmingly established by the evidence, was adverse as to plaintiffs, as it is only upon the theory that Potter and his vendors were their co-tenants that they seek to avoid his claim of title by adverse possession. It is not denied that the court had jurisdiction of the subject matter and of the real representatives of John B. Adams then in existence (some of whom are plaintiffs, and others having died are represented by their heirs, in this action) in the suit brought in April, 1866, by Randolph Adams as administrator of John B. Adams, against his heirs and creditors to settle his estate, but it is insisted by plaintiffs that the record in that case does not show that their interest in the land now in dispute was sold in that action, though ordered to be sold to pay their ancestor's debts. The records and papers in that old suit that are available at this late date are very meagre and obviously incomplete. Not only

so, but the record itself furnishes proof positive of great carelessness and frequent failure in recording upon the order book orders that were made in the case, as well as in preserving papers and written orders which were actually filed or lodged and treated as filed in the case. Reports of commissioners, written orders, etc., are noted of record as having been filed that are not found in the papers, while commissioners' reports and other papers are found with the papers in the case, both with and without indorsement of having been filed, of which there is no record in the order book. But we must take the record as we find it and from it decide in this, another action, between different parties, the question upon which depends plaintiffs' rights; and, as we approach this question, we are confronted with a controversy between counsel as to whether or not this is a collateral attack by plaintiffs upon the judgment in that case which ordered sold the undivided interest in the land now in dispute to pay the debts of their ancestor, from whom they claim to have inherited the land. Unquestionably if the old record shows affirmatively that the land was sold pursuant to the judgment which is recorded, ordering a sale thereof, and that the sale was confirmed, an attack upon its validity such as this would be a collateral attack upon the judgment in that case; and since the question now before us is whether a sale was made and confirmed of the land ordered therein to be sold, which must be determined from the record alone, there can be no doubt it seems to us that this is a collateral attack upon the judgment and record in that case. It is certainly not a direct attack against same. Harrod v. Harrod, 167 Ky. 308. The argument of counsel for plaintiffs that it is not a collateral attack against the judgment in that case because of the failure of the record to show that the judgment which was entered was enforced so as to divest them of title, is in our judgment unsound, because it assumes as true the very fact at issue, and which must be determined from the record in the old case. Considering then this action as a collateral attack by plaintiffs upon the judgment and proceedings had in that case, it seems to us every presumption must be indulged not only in favor of the validity and binding force of the judgment entered therein, to sustain which proposition the authorities are abundant, but also that customary and necessary pro-

ceedings in pursuance thereof were regularly taken to make the judgment effective and accomplish the purposes of the action. We are unable to find authorities in support of this latter proposition, but it seems a necessary corollary of the thoroughly established proposition that upon collateral attack it will be conclusively presumed in favor of the validity of the judgment that all prerequisite proceedings have been observed, even though not apparent from the record, and unless only the contrary affirmatively appears. Steel v. The Stearns Coal & Lumber Co., 148 Ky. 429; Baker v. Baker, Eccles & Co., 162 Ky. 683; Caudley v. Luttrell, 183 Ky. 551.

This old suit was instituted to settle the estate of John B. Adams and in pursuance of that design and as a necessary incident thereto it was adjudged that the land in dispute, of which he died the owner, be sold to satisfy his creditors, who had filed their claims therein. Even had the records shown nothing thereafter until the action by order of court was stricken from the docket, it seems only reasonable that the presumption would be warranted upon collateral attack that the master did his duty and sold the land and paid the proceeds to the creditors, as was necessary to fully carry out the judgment, and accomplish the purposes of the action, especially when the record itself is proof of the fact that the order book contains but a meagre and incomplete record of the proceedings actually had, and that the papers now in the record are but part of those actually before the court. Any other course, following such a judgment, would have been most unusual and extraordinary, and it certainly would be unreasonable to presume that the administrator abandoned his desire to settle his intestate's estate, and the creditors their desire to collect their claims after the judgment ordering a sale of this land for that purpose had been obtained, and that the master failed to perform his duty thereunder. However, the exigencies of this case, as extreme as they are, do not require us to carry the presumptions so far as above indicated, and we do not, of course, decide that it could be done; but, we are quite sure, and do hold, that at least upon this collateral attack, such orders as do appear of record following the judgment and order of sale, and which indicate that the land was sold as ordered, and which cannot reasonably be interpreted otherwise, should be so construed under a

presumption that the case after judgment proceeded in the usual way to a complete disposition of the matters involved, nothing appearing to the contrary. The record affirmatively shows that the decedent, John B. Adams, left no personal estate, but died the owner and in possession of one tract of land of four hundred acres, known as his "home farm," the one-half interest in the two hundred acres involved in this action, and an undivided one-ninth interest in his father's farm; that he left debts amounting to more than $500.00, excluding the Brashears' claim of $230.00 hereafter referred to, which were regularly allowed as claims against his estate; that the 400 acres of land known as his home farm was first ordered to be sold to pay his indebtedness; that it was sold by the master commissioner pursuant to the judgment, to Enoch Craft, for $341.00, for which the purchaser executed purchase money bonds; that the master commissioner was directed to collect these bonds and distribute the proceeds among the creditors; that the master reported he had collected these bonds in full and after ruled to do so had made distribution thereof. It was after these sale bonds had been collected and the proceeds applied to paying creditors a 30 per cent dividend upon their claims that the court adjudged it was necessary to sell decedent's undivided one-half interest in the land involved in this action, and his share in his father's farm to pay the unsatisfied claims against his estate and directed the master commissioner to sell same and to take from the purchaser for the purchase price sale bonds having the force and effect of replevin bonds. This judgment was entered at the May term, 1871. Following this judgment, at subsequent terms are orders with reference to a deed by the master to E. A. Craft, who purchased the 400 acres under the former sale, but there is no report of the commissioner found in the papers showing whether or not he sold decedent's one-half interest in the 200 acres of land and his share in his father's land, pursuant to the judgment so ordering him to do, nor is there any order that could have reference thereto until at the May term, 1873, when this order was made:

"John B. Adams' Admr. v. John B. Adams, Heirs.

"Commissioner's report confirmed and commissioner is directed to collect the money on the bonds and pay the same to the heirs and creditors."

The commissioner's report that was confirmed by that order is in the record and refers to a deed to Craft's assignee for the 400 acres sold to Craft, but the order directing the commissioner to collect the money on bonds and pay same to the heirs and creditors could not possibly have referred to the bonds executed by Craft for the 400 acres sold, as the record shows affirmatively that those bonds had theretofore been collected and the money distributed among the creditors, and there could have been no other bonds to be collected except such as the commissioner was directed to take from the purchaser of the one-half undivided interest in the 200 acres of land involved in this action, and decedent's share in his father's farm, nor could this order have been properly entered unless such sale had been made and confirmed. There was an order made at the May term, 1874, filing a commissioner's report and ordering it to lay over three days for exceptions, but the report is not found in the papers and this report was presumably in response to the order entered at the May term, 1873, directing him to collect the money on the bonds and pay same to the heirs and creditors, since there is no other apparent reason for a report from him. Plaintiffs try to avoid these inferences by assuming that these orders had reference to a sale in that action of a tract of 150 acres located on Thornton creek, as the land of decedent, which as shown by an order made at the October term, 1873, was conveyed by the master commissioner to Benjamin B. Adams, but this assumption is not warranted, both because there is no judgment and order of sale of this tract of land, and because the administrator in the amended petition in which he asked a sale of the decedent's one-half interest in the 200 acres of land and his interest in his father's farm, set out the fact that the decedent had no written evidence of title to the Thornton creek land but held same, if at all, only under a verbal contract from one Brashears who was dead and whose heirs were so scattered, and many of them infants, that it would be not only almost impossible to bring them before the court, but if done, would involve more expense than the land was worth. Hence we cannot presume that this land was ever ordered sold in this action as the land of decedent for the benefit of his creditor and heirs, as clearly the court would have had

no right so to do. It also appears from this amended petition of the administrator that about $230.00 of the indebtedness allowed against decedent's estate was represented by two notes to R. S. Brashears upon which Benjamin B. Adams was surety, and that the administrator stated not only that decedent did not own this Thornton creek land, but also recommended that because of that fact the allowance of the Brashears' claims should be set aside, and it is almost certain, while of course irregular since Brashears' heirs were not before the court, that the deed was made by the master commissioner to Benjamin B. Adams, who was surety upon the Brashears' notes, upon his payment of the notes, to Brashears' administrators, in order to relieve John B. Adams' estate of obligation therefor, and upon the idea that Brashears' estate having received the consideration for the land from Benjamin B. Adams, the latter was entitled to whatever protection a deed from the master in this case, and the payment of the purchase price, would afford him. This explanation of this deed is much more satisfactory than the wholly unwarranted assumption of plaintiffs that the one-half interest in the 200 acres of land ordered to be sold was never sold, but that the Thornton creek land, for the sale of which there was no judgment or any request or authority for one, was sold, and the purchase money bonds which the master was ordered to collect were given therefor. Our explanation is sustained and plaintiffs' assumption refuted by the deed itself, which the master made to Benjamin B. Adams for this land, for it is recited therein that the deed was made "for and on behalf of the heirs of R. S. Brashears, deceased, conveying all their right, title and interest" in the Thornton creek land to Benj. B. Adams, who had exhibited "a bond for said title survey" from "R. Brashears to John Adams and transfer or assigned to said Benjamin B. Adams"

We are, therefore, of the opinion that the old record contains sufficient to warrant the presumption, and nothing to the contrary, that the sale was made as ordered and the sale confirmed, and that the chancellor erred in adjudging plaintiffs the owners of an undivided one-half interest in the land involved in this action.

Wherefore the judgment is reversed and the cause remanded with directions to dismiss the petition as against the defendant W. H. Potter.